# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John F. Grady | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 96 C 5990 | **DATE** | April 23, 2002 |
| **CASE TITLE** | Ibanez v. Velasco, et al. | | |

MOTION:

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendants' motion to amend judgment [ ] is allowed to the extent that remittiturs are granted as to the punitive damage awards against the defendants Jeffer and Loizon. If plaintiff refuses to accept the remittiturs, or either of them, a new trial will be granted, on punitive damages only, as against Jeffer or Loizon or both. Plaintiff should file a statement by May 7, 2002 indicating whether she accepts or rejects the remittiturs. ENTER MEMORANDUM OPINION.

(✗) [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| X | Notices faxed by judge's staff. | | | |
| | Notified counsel by telephone. | | APR 2 5 2002 | 106 |
| | Docketing to mail notices. | | date docketed | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to _____ | | | |
| KAM | courtroom deputy's initials | U.S. DISTRICT COURT CLERK | date mailed notice | |
| | | 02 APR 24 PH 4:31 | KAM | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

(Reserved for use by the Court)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MICHELLE IBANEZ,                          )
                                          )
              Plaintiff,               )
                                          )
    v.                                   )   No. 96 C 5990
                                          )
ERNESTO VELASCO et al.,                   )
                                          )
                                          )
              Defendants.              )

**DOCKETED**

**APR 25 2002**

**MEMORANDUM OPINION**

The jury in this case found in favor of the plaintiff, Michelle Ibanez, on her claim that she was beaten and kicked by correctional officers without provocation when she visited a facility of the Cook County Sheriff's office. The physical abuse plaintiff suffered at the hands of the defendants is described at II.A, infra. The jury returned a verdict against three of the defendants, Valerie Jeffer, Patrick Loizon, and Frank Mazzuca, for compensatory damages in the amount of $2.5 million and separate punitive damages against the three defendants totaling another $2.5 million. The verdict was in favor of the other two defendants, Annie Coleman and Dina Jackson. Jeffer, Loizon, and Mazzuca have moved to amend judgment, arguing that the court committed various prejudicial trial errors and that the compensatory and punitive damages awards are both excessive.

106

In the first section of this opinion we will deal with the alleged trial errors, and in the second section we will address defendants' arguments concerning damages.

## I.   ALLEGED TRIAL ERRORS

### A.   Evidence Concerning the Conduct of Unidentified Correctional Officers

Defendants complain that the evidence of the melee resulting in plaintiff's injuries included testimony that other uniformed officers besides these defendants participated in the beating and kicking of the plaintiff and attempted to use their bodies to shield the assault from public view. We see no way the occurrence could have been described that would have omitted reference to the presence and conduct of these other officers. They assisted in the assault, some by striking and kicking plaintiff and others by attempting to obstruct the view of concerned onlookers. They were joint tortfeasors with the named defendants, and the fact that they were not named in the complaint is no defense to the defendants who were named.

There was certainly no danger that a named defendant, otherwise innocent of wrongdoing, would somehow be found liable, not for his or her own acts or omissions, but for the acts or omissions of these unidentified officers. The jury was clearly instructed that in order to be found liable a defendant had to have used excessive force or have failed to intervene to prevent the use of excessive force by others. (Court's Instructions Nos. 16, 17,

- 3 -

18, Tr. 1051-52.)  In short, the defendants suffered no unfair prejudice by reason of the evidence that there were unnamed joint tortfeasors.  They apparently understood this at the time of the trial, since they did not object to the evidence.

**B.  Exclusion of Evidence Concerning Plaintiff's Financial History**

Before the trial began, the court was asked to rule _in limine_ on the question of whether defendants would be allowed to cross-examine the plaintiff about her financial history.  The relevance was said to be that her financial problems could have been a cause of her amenorrhea (loss of menstrual periods).  The court ruled that such cross-examination would not be allowed unless and until expert medical testimony was presented to the effect that financial problems of the kind experienced by plaintiff could, to a reasonable degree of medical certainty, cause or aggravate her amenorrhea.  The court expressed skepticism about the proposition and made clear that it was not going to allow defense counsel to insinuate the subject into the trial simply by asking the plaintiff questions about it.

No such medical testimony was offered during the trial. Defendants refer now to the testimony by Dr. Puscheck in her pretrial deposition, which was read to the jury, to the effect that "financial stressors that she mentioned . . . may also be playing a role."  (Defendants' Memorandum in Support of Motion to Amend Judgment at 6 n. 12; Tr. 828.)  This testimony that unidentified

financial stressors "may also be playing a role," with no further explanation, did not provide the required medical foundation for cross-examining plaintiff about her financial history. Nor was any other medical witness asked about a connection between any financial problems and plaintiff's amenorrhea.

Because the defendants made no effort to lay a proper foundation for cross-examining plaintiff about her financial problems (Tr. 940-42), the motion to conduct the cross-examination was properly denied.

### C.   **Failure to Intervene**

The jury was instructed that a defendant could be found guilty of using excessive force or for failing to intervene to prevent the use of the excessive force by others. Specifically, the jury was told that a defendant could be found liable:

> [I]f you find, first, that the defendant had reason to know that excessive force was being used. Second, that the defendant had a realistic opportunity to intervene to prevent the harm from occurring and failed to do so. Third, that the defendant's failure to intervene was a proximate cause of injury to the plaintiff.

(Court's Instruction No. 17, Tr. 1051-52.) We believe this instruction is a correct statement of law, see Yang v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994), and defendants do not argue to the contrary. What they argue is that this was a "new theory" introduced at trial which "severely prejudiced the defendants." (Defendants' Memorandum at 13 n.22.) But defendants do not explain how they were unfairly prejudiced by an instruction that simply

described for the jury the legal consequence of facts which had been in the case from the time of the occurrence. It is "widely recognized" that law enforcement officials have an affirmative duty to intervene to protect citizens' constitutional rights from infringement by other law enforcement officers in their presence. See Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994) (citing cases). Depositions were taken of most of the occurrence witnesses, and at the time of the trial it was not news to the defendants that, according to plaintiff and her witnesses, none of the defendants did anything to prevent the use of excessive force they saw being used by other defendants. In fact, the defendants had no reason to think they would not be held accountable for their failure to intervene. They have not explained how their trial preparation or their conduct of the trial itself would have been any different had the matter of intervention never been mentioned. See generally Akrabawi v. Carnes Co., 152 F.3d 688, 693 (7th Cir. 1998) (affirming grant of leave to amend pleading on final day of trial where the amendment was a "logical outgrowth of the evidence" and it "seem[ed] inconceivable" that appellant had not anticipated the theory).

The defendants whose liability depended upon a failure to intervene, and little else, were the two defendants who were found not guilty, Annie Coleman and Dina Jackson. The three defendants who were found guilty--Jeffer, Loizon and Mazzuca--were all shown

by the testimony to have actively participated in the physical abuse of the plaintiff. It is doubtful, therefore, that the intervention theory played a role in the verdict against these defendants. But if it did, there was nothing unfair about it.

### D. **Evidence of Dr. Grimes's Bill**

Defendants' retained medical expert was Dr. Elwyn M. Grimes, who testified that, in his opinion, plaintiff's brain tumor had already begun to form prior to the occurrence, and plaintiff's amenorrhea was caused by the tumor. He was not asked on direct or cross-examination about his fee for examining the medical records and testifying in court. (He did not examine the plaintiff.) During rebuttal, plaintiff's attorney requested leave to offer evidence, either by reading from Dr. Grimes's pretrial deposition or by offering the bill in evidence, that Dr. Grimes's bill was $6,000.00. Over defendants' objection, the court permitted the evidence. Defendants argue that they were prejudiced by this because Dr. Grimes was denied the opportunity to explain his bill.

Ideally, the matter would have been covered on cross-examination and Dr. Grimes would have offered any explanation he had for his $6,000.00 bill at that time. Through the oversight of plaintiff's counsel, that did not happen. The court was therefore confronted with a choice: keep the amount of the bill from the jury, or let the jury know the amount of the bill and let the defendants recall Dr. Grimes to give whatever explanation he had.

As between the two alternatives, it seemed to the court then, and still seems, that the better one was to let the jury have the information. Dr. Grimes was put forward by the defendants as a disinterested expert witness. From his testimony, the jury had no idea whether he had any financial interest in testifying for the defendants. The bill he rendered may or may not have affected the jury's evaluation of his credibility, but we believe it was a fact they were entitled to have. There may have been a good explanation, but on its face the bill was an extraordinarily high charge for the modest amount of time the witness had spent. There was no indication that the defendants could not have recalled him to testify about the bill. It may or may not have been an inconvenience for the witness (defendants offered no evidence that it would have been), but it is clear enough that the defendants would have paid him well for the additional time. The fact that the witness was not recalled may be due to the simple fact that he could not have justified his bill. This court has grown accustomed to the inflated fees that are often charged by expert witnesses. The matter is frequently the subject of cross-examination, and we can recall offhand no instance where an explanation by the witness has made the fee seem less questionable.

In short, we think the probative value of the information about the bill outweighs any prejudice to the defendants from the fact that the information came out only after the witness had left

the stand. Moreover, had the defendants believed that the witness could explain away any adverse inference based on the size of his bill, they could have recalled him to give the explanation. Recalling him would not have unduly magnified the matter, since the jury understood that it was the plaintiff who put the evidence in out of order in the first place.

### E. Closing Argument

Defendants complain about several aspects of the closing argument of plaintiff's attorney.

Defendants say they were prejudiced by a claim in final argument that their conduct was responsible for an inability of plaintiff to have children. They objected, and, as defendants acknowledge, the objections were sustained. (Defendants' Memorandum at 1.) The court went further and in each of the two instances instructed the jury to disregard the statement. (Tr. 994-95, 996.) In light of the fact that there was no evidence that plaintiff had been attempting to become pregnant, or that she was even sexually active, and that there was no medical testimony tying the occurrence to a loss of childbearing ability, the court does not believe that counsel's brief references in argument were prejudicial. There is no reason to think that the jury did not follow the court's instructions and disregard the statements as not being based on the evidence. Absent any indication to the contrary, we presume that jurors follow the instructions they are

given.  See National Org. for Women, Inc. v. Scheidler, 267 F.3d
687, 705 (7th Cir. 2001).

Defendants complain of various references in plaintiff's final
argument to a connection between plaintiff's pituitary tumor and
the stress caused by the occurrence.  It is true, as defendants
argue, that the doctors on both sides of the case testified that
the occurrence did not cause the tumor.  The argument that there
was a connection between stress from the accident and growth of the
tumor could have been objected to by defendants, but they did not
object.  Clearly, it was not the role of the court to intervene on
its own motion and direct counsel to stop arguing the point.  It
is, rather, for the court to rule on objections that are made.
Objections that are not made are waived, see Holmes v. Elgin,
Joliet & E. Ry. Co., 18 F.3d 1393, 1398 (7th Cir. 1994), and
defendants' suggestion on this post-trial motion that the arguments
of plaintiff's attorney were plain error is unpersuasive.  "The
plain error doctrine has an extremely narrow application to civil
cases. . . ." Frobose v. American Sav. & Loan Ass'n, 152 F.3d 602,
613 (7th Cir. 1998).  Even if the plain error doctrine were
available, defendants have not shown that exceptional circumstances
exist, substantial rights are affected, and a miscarriage of
justice will result if the doctrine is not applied.  See, e.g.,
Prymer v. Ogden, 29 F.3d 1208, 1214 (7th Cir. 1994) (outlining the
necessary showing for plain error).

Defendants object to the fact that plaintiff's attorney argued for the future cost of MRIs to measure the growth of the pituitary tumor. (Tr. 993-94.) Again, however, there was no objection. Moreover, the compensatory damage instruction the court gave the jury made no mention of any future medical expenses. (Court's Instruction No. 20, Tr. 1053.) Therefore, not only was the point waived by the failure to object, but we think it highly unlikely that the jury allowed any sum for future MRIs in any event.

### F. Jury Instructions

Defendants take exception to several aspects of the court's jury instructions on damages.

First, defendants complain of the court's instruction on mitigation of damages. The court gave a modified version of IPI Civil 33.01, as follows:

> In fixing the amount of money which will reasonably and fairly compensate the plaintiff, you are to consider that an injured person must exercise ordinary care to obtain medical treatment. Damages proximately caused by a failure to exercise such care cannot be recovered. The defendants have the burden of proving any damages which the plaintiff incurred by failing to act reasonably in regard to obtaining medical care.

(Court's Instruction No. 20, Tr. 1053.)

At the jury instruction conference, the defendants tendered their Instruction No. 3, addressed to the question of mitigation. Defendants' objection to the mitigation portion of Court's Instruction No. 20 was simply that their No. 3 should be given instead. They did not point out any respect in which the Court's

No. 20 was inaccurate or in which their No. 3 was superior. (Tr. 879.) In the court's view, the IPI instruction was superior in that it was addressed to the specific mitigation issue in this case, the possible failure of plaintiff to "exercise ordinary care to obtain medical treatment." Defendants' Instruction No. 3 spoke in generalities about the failure to minimize damages, without specifying what damages were involved or what the failure might have consisted of. These generalities, expressed somewhat repetitiously at that, would have given the jury no help. The shorter IPI instruction, addressed to the specific issue, was obviously not prejudicial to the defendants and this is why they could think of no objection to make at the instruction conference other than the fact that they preferred their Instruction No. 3.

Now, on this post-trial motion, defendants make an objection that they did not make at trial, which seems to have been prompted by their disappointment at the size of the compensatory verdict. They argue that we erred by not including in the mitigation instruction a direction to the jury "that they must make an adjustment for the possibility that the preexisting condition would have resulted in harm to the plaintiff even if there had been no tort." (Defendants' Memorandum at 7.) They inform us that "[t]his omission is fatal." (Id.) But defendants made no such objection at the instruction conference or at any other time during trial, nor did they submit such a proposed instruction of their own. "No

party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Fed. R. Civ. P. 51; Stachniak v. Hayes, 989 F.2d 914, 920 (7th Cir. 1993) ("[I]f a party fails to make a specific, timely jury instruction objection during trial, an argument regarding that jury instruction is deemed to be waived for purposes of appeal.").

Even if defendants had not waived this argument, it would fail. Stoleson v. United States, 708 F.2d 1217 (7th Cir. 1983), and Abernathy v. Superior Hardwoods, Inc., 704 F.2d 963 (7th Cir. 1983), cited by defendants, hold only that when a preexisting condition is of the type that might have caused the injury complained of independently of the tort, this should be considered by the trier of fact in assessing damages. Here, the injuries included post-traumatic stress disorder and recurrent major depression. It is not evident that either emotional injury would have occurred without the attack by defendants. The very term "post-traumatic stress disorder" signifies a reaction to a particular trauma. And the mere fact that plaintiff's major depression recurred does not mean that it would necessarily have recurred without the tortious conduct of the defendants.

## G.   The Court's Colloquy With the Deliberating Jury

During deliberations, the jury sent the court a note inquiring as follows: "Judge Grady, is there a range of money for compensatory and punitive damages that we should be considering?" The court discussed the question with counsel and reached agreement in general terms as to what the answer should be.  (Tr. 1063-65.) The jury was recalled to the courtroom and the court gave an answer to the question, the substance of which was that there probably was a range of reasonable compensation for compensatory damages, but the range was for the jury to decide on the basis of the evidence; and that any punitive damages should be assessed individually against any defendant found liable for them, bearing in mind the purposes of punitive damages as outlined in the written instructions the jury had been given (copies of which had been provided for each juror to take into the jury room upon retiring). (Id. at 1065-67.)  A juror then followed up with a question as to whether one element of compensatory damages might be more important than another.  We gave the following response:

> THE COURT: That's for you to decide.  For instance, just on the spur of the moment, pain and suffering versus medical bills.  Well, I don't think I am putting words in Mr. DeRose's mouth when I say that the plaintiff's point of view would be that the pain and suffering is more important than the $5,000 worth of medical bills.
>
> So in that sense, yes, perhaps one element is more important than another, or could be.  But that is for you to decide.

(<u>Id.</u> at 1067.)  Defendants argue that this response was something the plaintiff's attorney had never argued, and therefore it could have been interpreted by the jury as advocacy by the court. (Defendants' Memorandum at 10.)  This seems a strained interpretation of the court's remarks.  Had defense counsel had any concern at the time, they could easily have brought up the matter after the jury had gone back to the jury room and the court could have considered whether some further admonition to the jury was needed.  But counsel made no objection or comment, and the court had no opportunity to consider the argument they now make.

In fact, we do not see how the jury could have thought the court was taking sides.  We chose a self-evident fact--that the $5,000 in medical bills was not being emphasized by plaintiff as much as her claim for pain and suffering--for the very purpose of giving a neutral illustration of how one element of damages could be more important than another, but even then we concluded by saying, "but that is for you to decide."  Mr. DeRose did, in fact, state in his argument to the jury that the case was not about plaintiff's relatively minor physical injuries but about her emotional injuries.  "This case isn't about those little wounds. Those wounds are healed in a week or two.  That's not what this case is about."  (Tr. 1037.)

The court stated the following in regard to punitive damages:
Now let's turn to punitive damages.  You will recall from
the instructions that there are two purposes:  First

punishment of the particular wrongdoer in this case, if you find that there has been any wrongdoer; and second, deterrence of these or this defendant and others from committing similar wrongs in the future.

So the question is what do you believe is a sufficient sum of money to accomplish those two purposes as to each defendant you may find liable for punitive damage. I am not suggesting that you have or should find anybody liable for punitive damages.

Bear in mind that you should have the element of reasonableness in mind on punitive damages just as much as you do on compensatory damages. It ought to be that amount which is reasonably necessary to accomplish these objectives, and not some amount that you just throw in for good measure for no particular reason.

But here again, it's a matter of your judgment. You are the people who heard the evidence. You know more about this case than anybody in the world. And the law says you are the ones to make the decision.

(Tr. 1066-67.)

The defendants make the following argument in regard to the court's statement: "The prepositional use of the word 'but' might have erroneously given the jury license to use its own judgement in derogation of the previously cited rule of law." (Defendants' Memorandum at 9.) That is the complete argument. We gather that the "but" referred to is the first word of the fourth paragraph of the quoted language, and the "previously cited rule of law" is the language of the first three paragraphs.

The idea that the jury could have misunderstood what the court was saying was not suggested by counsel at the time, so, again, the court had no opportunity to consider the possibility. Even now, it is difficult to make sense of defendants' suggestion. Taken in

context, we think there is no likelihood the jury was misled. "With instructions, we don't pick nits; we examine the whole of what was given and look for overall fairness and accuracy." Midcoast Aviation, Inc. v. General Elec. Credit Corp., 907 F.2d 732, 741-42 n.7 (7th Cir. 1990).

## II. DAMAGES

### A. Pertinent Facts Regarding Defendants' Conduct

On September 19, 1995, plaintiff went to a facility of the Cook County Jail to retrieve her boyfriend's property. The jury heard testimony from plaintiff and four bystander witnesses that defendants engaged in an unprovoked beating and kicking of plaintiff after she took the property from the "property window" (after waiting for several hours) and turned to leave. The details of defendants' conduct are as follows.

Plaintiff testified that Officer Jeffer used profanities when speaking to her and then, after the beating began, pulled her hair, scratched her, and punched her. (Tr. 852-56.) She also remembered Officer Loizon standing over her and choking her by placing his fingers on her trachea. (Id. at 856-57.) Plaintiff did not, and could not, testify about many of the details of the beating because she was curled up on the floor while being beaten, lost consciousness for some period of time, and was disoriented thereafter. (Id. at 855-61.) However, four other witnesses saw the occurrence and were able to describe it vividly.

Angela Rodriguez testified that when plaintiff went to the property window, Officer Jeffer asked plaintiff, "[Y]ou got your ID, you yellow bitch?"[1]  (Id. at 301-03.)  Ms. Rodriguez then saw Jeffer "punching and kicking [plaintiff] on the head, and just constantly kicking and punching . . . Could have been maybe ten, 15 times."  Ms. Rodriguez indicated that Jeffer was using a closed fist to punch plaintiff while plaintiff was on the floor, curled up in a ball.  (Id. at 306-07.)

Another witness, Tamela Clare, testified that she heard Jeffer say the phrase "yellow bitch" to plaintiff.  (Id. at 539-42.)  She then saw Jeffer come out from behind the property window, run up to plaintiff, and pull her by the hair to the floor.  (Id. at 543.) According to Mrs. Clare, Jeffer yelled obscenities at plaintiff, hit plaintiff in the facial area several times, and kicked plaintiff's legs and side.  (Id. at 544-46.)  A number of other police officers rushed to assist Jeffer and took turns hitting and kicking plaintiff as well.  (Id. at 546.)  Officer Loizon held plaintiff by the neck and told her to shut up.  (Id. at 547.) Loizon also held plaintiff by her ankles and helped Officer Mazzuca and another officer drag plaintiff outside.  (Id. at 551-53, 569.)

Doris Gayden, another woman who was at the Cook County Jail that day, testified that Officer Jeffer called plaintiff a "bitch,"

---

[1]  Ms. Rodriguez testified that she understood the expression to be "a racial slur for a mixed child from a mixed marriage."  (Tr. 303.)

ran out from behind the property window, knocked plaintiff down, and beat her. Mrs. Gayden made a clenched fist and made repeated striking motions with her arm to demonstrate exactly how Jeffer was hitting plaintiff. (<u>Id.</u> at 594-97.) According to Mrs. Gayden, other police officers surrounded plaintiff and stomped their feet on plaintiff's head, including Officer Mazzuca. (<u>Id.</u> at 595, 599-600, 607.) The officers were "just beating [plaintiff], just beating that lady right there, just beating." Repeatedly during the course of her testimony, Mrs. Gayden made a pounding motion with both fists to illustrate what she had witnessed. (<u>Id.</u> at 601.)

Marvin Turner testified that Officer Jeffer swore at plaintiff, using the word "bitch," and then came out from behind the property area window and punched plaintiff in the back of the head with a closed fist, knocking her down. (<u>Id.</u> at 613-17.) Other police officers joined in; some were hitting and kicking plaintiff, and others appeared to be attempting to block witnesses' view of the incident. (<u>Id.</u> at 618-19.) According to Turner, Officer Mazzuca held plaintiff on the floor by putting his foot on her neck, and he kicked her a few times as well. (<u>Id.</u> at 622.)

In our years on the bench, we have never seen witnesses more credible than these four people. They were completely independent, having no connection with any of the parties and no conceivable motive to lie. Gayden and Turner were mother and son, but

Rodriguez and Clare did not know each other, nor did they know Gayden and Turner. Their demeanor on the witness stand was compelling, and cross-examination served only to emphasize the truth of their testimony. These witnesses were so shocked at the defendants' unprovoked brutality that they wrote their names and telephone numbers on a piece of paper for plaintiff as she sat dazed on the concrete steps outside the building where defendants had dumped her.

Defendants' version of the events was that plaintiff, when standing at the property window, reached through the window and grabbed the property she was picking up without signing for it and without permission from Jeffer (who was waiting on plaintiff). Jeffer also testified that plaintiff threw a pen at her and Jeffer told her to "discontinue [her] attitude." (Id. at 216.) According to defendants, Jeffer never swore at plaintiff. Defendants also testified that Jeffer did not knock plaintiff down, but that plaintiff sat down on the floor voluntarily, clutching the property envelope, and that plaintiff was not hit or kicked; Jeffer merely tugged at the property envelope to get it back. (Id., Testimony of Jeffer, Loizon, Mazzuca.) According to Loizon and Mazzuca, they did not drag plaintiff outside; they merely took her by the arm and walked, or "escorted," her outside. (Id. at 170, 740.) Loizon and Mazzuca testified that outside, plaintiff tried to kick (or did kick) Loizon. (Id. at 177, 741-42.) Loizon stated that his

parting remark to plaintiff was "have a nice day." (Id. at 171-72.)

### B.   Compensatory Damages

We must accord substantial deference to a jury's determination of compensatory damages.  See Ramsey v. American Air Filter Co., 772 F.2d 1303, 1313 (7th Cir. 1985).  The Seventh Circuit uses three criteria to review a compensatory damages award: (1) whether the award is "monstrously excessive"; (2) whether there is no rational connection between the award and the evidence; and (3) whether the award is roughly comparable to awards made in similar cases.  See Tullis v. Townley Eng'g & Mfg. Co., 243 F.3d 1058, 1066 (7th Cir. 2001).  Because the Seventh Circuit views the "monstrously excessive" standard as "rather vague," it has suggested that it be merged with the rationality inquiry.  See U.S. EEOC v. AIC Sec. Investigations, Ltd., 55 F.3d 1276, 1285 n.13 (7th Cir. 1995).

Defendants contend that the jury's $2.5 million award of compensatory damages fails these tests.  First, defendants argue that the award is "monstrously excessive" and has no rational connection to the evidence produced at trial.  They contend that the compensatory damages awarded were "astronomical" and point out that plaintiff's medical bills totaled just $5,737.33. (Defendants' Memorandum at 2-3.)  Defendants speculate that the jury "was infected with emotions to such a degree it colored their

judgement," but offer no analysis as to why they believe that. (<u>Id.</u> at 2.)

With respect to compensatory damages, the jury was instructed to consider "[t]he disability resulting from the injury, the aggravation of any preexisting ailment or condition, the pain and suffering experienced and reasonably certain to be experienced in the future as a result of the injury, the emotional distress experienced and reasonably certain to be experienced in the future, [and] the reasonable expense of necessary medical care, treatment and services received." (Court's Instruction No. 19, Tr. 1053.)

While her physical injuries were not severe, plaintiff presented evidence of bruising, scratches, and neck strain. She testified that after the incident, she felt pain in her neck, right arm, and right side, and had difficulty swallowing. (Tr. 902-03.) Shortly thereafter, she did not get her menstrual period when expected, and got her period only three or four times in the next few years. (<u>Id.</u> at 904-06.) Plaintiff also testified that following the incident, she felt depressed and often had crying episodes. (<u>Id.</u> at 921-22.) She continues to have periods of depression and spontaneous crying episodes and said she feels "emotionally handicapped." (<u>Id.</u> at 924.)

Plaintiff's testimony alone may have been sufficient to support the award,[2] but there was also testimony from several professionals regarding plaintiff's injuries. Dr. Puscheck, plaintiff's reproductive endocrinologist, testified (in a deposition that was read to the jury) that plaintiff suffered amenorrhea after the incident. (Id. at 806-08). In Dr. Puscheck's opinion, plaintiff's history suggested that the amenorrhea was associated with the police altercation. (Id.) During one of plaintiff's appointments with her, Dr. Puscheck noted that plaintiff cried and complained of fatigue and depression. (Id. at 818.)

Plaintiff's licensed clinical social worker, Diane Plotkin, testified about plaintiff's emotional injuries. When plaintiff met with Ms. Plotkin, plaintiff complained of overwhelming sadness, suicidal thoughts, anxiety, panic, fatigue, overeating, and recurrent bulimic behavior following the beating. (Id. at 659.) Ms. Plotkin's assessment was that plaintiff was suffering from post-traumatic stress disorder ("PTSD") and recurrent bulimia. (Id. at 671.) Throughout the months that plaintiff was treated by Ms. Plotkin, plaintiff complained of depression, overeating, suicidal thoughts, fatigue, and panic attacks. (Id. at 677, 679,

---

[2]  The Seventh Circuit has indicated that "[a]n award for nonpecuniary loss can be supported, in certain circumstances, solely by a plaintiff's testimony about his or her emotional distress." Tullis, 243 F.3d at 1068; see also Niebur v. Town of Cicero, No. 98 C 4157, 2002 WL 485695, at *22 (N.D. Ill. Mar. 29, 2002) ("[T]he Seventh Circuit has not established any requirement that claims of emotional injury must be supported by corroborating testimony.").

680-82.) Ms. Plotkin considered plaintiff's problems serious enough that she referred plaintiff to a psychiatrist, Dr. Sylvia Santos. (Id. at 683.) Ms. Plotkin concurred with Dr. Santos's diagnosis of PTSD and major depression, and considered the beating to be the cause of both problems. (Id. at 689-91.)

Dr. Santos testified that plaintiff suffered from PTSD as a result of the beating. (Id. at 468-471.) According to Dr. Santos, plaintiff showed the core symptoms of PTSD--re-experiencing the trauma through nightmares and waking thought, avoidance and numbing, and hyperarousal, such as sleep difficulties and concentration problems. (Id. at 470.) Dr. Santos also diagnosed plaintiff as having a recurrence of major depression as a result of the incident, evidenced by depressed mood, weight gain, insomnia, loss of energy, feelings of worthlessness and low self-esteem, thoughts of death, and the inability to concentrate. (Id. at 471-75.)

The jury was able to observe plaintiff, and they apparently found her testimony to be credible. They also heard from the professionals who had examined plaintiff, who testified that plaintiff suffered physical pain, gynecological problems, and substantial emotional distress as a result of the incident, and evidently found these injuries sufficient to warrant the large

award of compensatory damages.[3]  In light of the evidence, we
cannot say that no rational connection between the award and the
evidence existed.

Defendants also argue that the award of compensatory damages
is not comparable to awards in similar cases.  However, to support
their argument, defendants fail to cite a single case that is
similar to the instant case.  They quote Tullis, 243 F.3d 1058,
which involved a retaliatory discharge claim and discussed awards
in other retaliatory discharge cases,[4] and various other employment
discrimination and harassment cases.[5]  While employment
discrimination can cause emotional distress, the defendants have
not pointed to any discrimination case that produced post-traumatic

---

[3]  "'It is within the jury's province to evaluate the credibility of
witnesses who testify to emotional distress, and we shall not disturb those
credibility determinations on appeal.'"  Tullis, 243 F.3d at 1068.

[4]  The plaintiff in Tullis brought claims under the Americans with
Disabilities Act and the Illinois Workers' Compensation Act.  243 F.3d at 1061-
62.  Tullis discussed compensatory damages awards for emotional distress in other
retaliatory discharge cases, including Avitia v. Metropolitan Club of Chicago,
Inc., 49 F.3d 1219 (7th Cir. 1995), Fleming v. County of Kane, 898 F.2d 553 (7th
Cir. 1990), Kasper v. Saint Mary of Nazareth Hosp., 135 F.3d 1170 (7th Cir.
1998), Jackson v. Bunge Corp., 40 F.3d 239 (7th Cir. 1994), and Peeler v. Village
of Kingston Mines, 862 F.2d 135 (7th Cir. 1988).

[5]  Shannon v. Fireman's Fund Ins. Co, 156 F. Supp. 2d 279 (S.D.N.Y. 2001)
(addressing compensatory damages for age discrimination claim) (citing DiStefano
v. Long Island Rail Road Co., No 96 CV 5487, 1999 WL 1704784 (E.D.N.Y. Dec. 21,
1999) (employment discrimination) and Bick v. City of New York, No. 95CIV.8781,
1998 WL 190283 (S.D.N.Y. Apr. 21, 1998) (employment discrimination)); Dubin v.
LaGrange Country Club, No. 95 C 5316, 1997 WL 323831 (N.D. Ill. June 11, 1997)
(sexual harassment claim against former employer); Enright v. Illinois State
Police, No. 97 C 8688, 2000 WL 420857 (N.D. Ill. Apr. 18, 2000) (retaliation and
employment discrimination); Neal v. Honeywell, Inc., 995 F. Supp. 889 (N.D. Ill.
1998) (retaliatory discharge) (citing Nyman v. FDIC, 967 F. Supp. 1562 (D.D.C.
1997) (retaliation and employment discrimination)); Fowler v. N.Y. Transit Auth.,
No. 96 Civ. 6796, 2001 WL 83228 (S.D.N.Y. Jan. 31, 2001) (retaliation and
employment discrimination).

stress disorder. In addition, defendants cite the wildly inapposite case of <u>Butler v. Dowd</u>, 979 F.2d 661 (8th Cir. 1992), involving inmates' Eighth Amendment claims against prison officials for failing to protect them from being raped by other inmates.[6] Defendants also cite <u>Martin v. Richard</u>, 333 So. 2d 668 (La. Ct. App. 1976) and <u>Greenville Board of Fire Commissioners v. New York State Division of Human Rights</u>, 277 A.D.2d 314 (N.Y. App. Div. 2000), both of which dealt with damages for amenorrhea but neither of which is relevant here. <u>Martin</u> does not constitute a "similar case"; the sole similarity is that the plaintiff complained of amenorrhea from a battery. In any event, it does not assist us because the trial and appellate courts there <u>rejected</u> plaintiff's claim that the battery caused the amenorrhea. 333 So. 2d at 670. <u>Greenville</u> involved damages for amenorrhea, but within the context of an employment discrimination claim. 277 A.D.2d at 314-15.

The isolated cases cited by defendants do not support their argument that the compensatory verdict here exceeds some supposed upper limit of reasonableness for this type of case. Individual cases can differ from each other enormously in terms of witness

---

[6]/ <u>Butler</u> affirmed nominal damage awards of $1 each for plaintiff/inmates who had been raped by fellow inmates and who sued prison officials for their deliberate indifference to a pervasive risk of sexual assault in the prison. That case is very different from the instant case because in <u>Butler</u>, there was no medical evidence presented at trial of the plaintiffs' physical injuries or of the extent of their emotional injuries. 979 F.2d at 669. Moreover, "[t]here [was] considerable evidence in the record from which the jury could have concluded that the plaintiffs' testimony concerning their injuries was not credible and could have disbelieved the extent of their injuries." <u>Id.</u> at 672.

credibility, the quality of the presentation, the nature and extent of the injuries, the vulnerability of the victim, the reactions of jurors to the particular circumstances, and hosts of other variables. Because defendants cite no cases that are even remotely similar to this case (i.e., involving the same kind or degree of emotional damage), their argument that the award of compensatory damages is not comparable to awards in similar cases has no basis.

Aside from their failure to cite comparable cases, the defendants avoid any analysis of the experience they put the plaintiff through, the permanent emotional injury that resulted, and the amount of money that could reasonably be considered the upper limit of fair compensation for that injury. In their final argument to the jury, the defendants elected not to suggest an amount that would be consistent with the evidence.[7] It is common for defense counsel in final argument to deny liability but nonetheless offer a fallback argument that, should the jury find liability, the evidence would not justify more than a certain amount of damages. Counsel then explain the basis for the figure they suggest. It is easy to understand why counsel made no such argument in this case: they had no rational basis to offer for an upper limit on plaintiff's damages. What amount is it, and what is the explanation for that amount? Even now, with the verdict in and

_____

[7] Neither did plaintiff suggest a specific amount or range of either compensatory or punitive damages. The jury was essentially left at sea by the parties as to appropriate amounts of damages.

plenty of time to think about it, defendants suggest no figure or range of figures that would be the upper limit of reasonable compensation.

Defendants got the jury trial they demanded. They do not like the result, but considering all of the facts and circumstances, we have no basis for setting aside the verdict on compensatory damages.

### C. **Punitive Damages**

The jury returned punitive damage verdicts of $1,867,500.00 against Jeffer, $622,500.00 against Loizon, and $10,000 against Mazzuca.

Defendants argue that the award of punitive damages warrants a new trial or remittitur because it violates their constitutional rights. The Eighth Amendment and the Due Process Clause prohibit the imposition of "grossly excessive" punishments on tortfeasors. See Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 434 (2001). The underlying principle is that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty" that may be imposed. See BMW of North Am., Inc. v. Gore, 517 U.S. 559, 574 (1996).

To decide whether a punitive damages award is unconstitutionally excessive, we focus on three general

"guideposts." First, and most importantly, we consider the degree of reprehensibility of defendants' conduct. Second, we look at the relationship between the amount of the punitive damages award and the harm or potential harm suffered by the plaintiff. Third, we examine the sanctions imposed in other cases for comparable misconduct. See id. at 574-75; see also Cooper, 532 U.S. at 440. Other factors, such as the deterrent goal of punitive damages and the financial impact that an award will have on a defendant, are relevant as well. See Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 21-22 (1991); TXO Prod. Corp. v. Alliance Resources Corp., 509 U.S. 443, 462 (1993); Merriweather v. Family Dollar Stores of Ind., Inc., 103 F.3d 576, 581 (7th Cir. 1996).

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." BMW, 517 U.S. at 575; see also Shea v. Galaxie Lumber & Constr. Co., 152 F.3d 729, 736 (7th Cir. 1998). In this case, the defendants' violence against the helpless plaintiff (described supra II.A) was particularly reprehensible. They abused the broad authority entrusted to them as law enforcement officers. The evidence showed that there was no need for defendants to apply any force against plaintiff, much less the amount of force that they used.

Moreover, defendants' use of force did not begin as an effort to defend themselves or to restrain plaintiff from causing a

disturbance. It was from the beginning an unprovoked, malicious battery, inflicted for the sole purpose of causing harm. There was no excuse of any kind for what they did. Defendants also insisted throughout the trial that they were innocent in the face of the overwhelming evidence against them. Adding a final insult to the injuries they had inflicted, they argued that the plaintiff had fabricated her case against them.[8] The jury found that it was the defendants who had lied. The jurors had to conclude that the defendants were utterly without remorse for their outrageous misconduct and the injuries they had caused. This is a factor that weighs heavily in support of a large punitive damages award. See Davis v. Rennie, 264 F.3d 86, 115-16 (1st Cir. 2001) (citing Hall v. Ochs, 817 F.2d 920, 927-28 (1st Cir. 1987) (punitive damages award justified not only by defendants' initial conduct, but also by subsequent behavior) ("[A] factfinder might infer that the stark clash [between plaintiff's and defendants' versions] could not have resulted from innocent misrecollection, and that its intentional

---

[8] Defense counsel argued as follows in her closing statement: "[P]laintiff's protestations of ignorance, that [she] didn't know [that the defendants] want[ed] the [property envelope] back, that's inherently unbelievable." (Tr. 1003.) "[H]ow do we know that the plaintiff wasn't beaten in the manner as described by Ms. Clare, Ms. Rodriguez, Ms. Gayden, Mr. Turner? . . . Well, the plaintiff herself doesn't recall those round-robins of kicks and punches and--that each described. Well, the plaintiff tries to tell you now, maybe it happened while I was unconscious. . . . But none of her witnesses said she was unconscious." (Id. at 1003-04.) "[W]hat else doesn't support this theory of this horrific, intense beating that was described by the witnesses? Well, pictures. . . . And in the event [plaintiff] had been kicked in a round-robin style as she lay helpless on the floor in a crouched position, . . . don't you think there'd be [bruises and cuts]?" (Tr. 1006.) "What really doesn't make sense is that if plaintiff was brutalized like she says, why does she come back into the lobby?" (Id. at 1014.)

quality intensified any need the jury may have found for punishment and deterrence.")).

The second factor in the punitive damages inquiry is the relationship between the amount of the punitive damages award and the harm or potential harm suffered by the plaintiff. This inquiry is sometimes expressed by examining the ratio of compensatory damages to punitive damages, which here is 1 to 1. The ratio appears to indicate that the punitive damages award is reasonable because the ratio is lower than--in some cases <u>much</u> lower than-- other ratios found by federal courts to pass muster. <u>See, e.g.</u>, <u>TXO</u>, 509 U.S. at 457 (526:1 ratio allowed); <u>Shea</u>, 152 F.3d at 736 (2500:1 ratio permissible). Thus, the 1 to 1 ratio is not completely "meaningless," as defendants suggest. But it is probably not a strong indicator of reasonableness here; when compensatory damages are very high, a low ratio does not necessarily indicate that the punitive damage award is reasonable. <u>Cf.</u> <u>Cooper v. Casey</u>, 97 F.3d 914, 919 (7th Cir. 1996) ("The smaller the compensatory damages, the higher the ratio of punitive to compensatory damages has to be in order to fulfill the objectives of awarding punitive damages . . . ."); <u>see also</u> 2 John J. Kircher & Christine M. Wiseman, <u>Punitive Damages: Law and Practice</u> § 18:06, at 18-40 (2d ed. 2000) ("[The ratio inquiry] functions best in situations of utter extremity, where the punitive damages are so

much greater than the actual damages that they appear blatently [sic] excessive to the court.").

Moreover, "[t]he Supreme Court . . . has never held that simple mathematical ratios are the be-all and end-all in punitive damages analysis." Shea, 152 F.3d at 736; see also Cooper v. Casey, 97 F.3d at 919 ("[A] mechanical ratio, such as two to one or three to one or four to one or even ten to one, would not make good sense.") Rather, the overall concern is reasonableness in the context of harm. We ask if the award was reasonable in light of the actual harm suffered by plaintiff and the potential harm that the defendants' conduct would have caused. See BMW, 517 U.S. at 581-83 (citing TXO, 509 U.S. at 460 ("It is appropriate to consider the magnitude of the potential harm that the defendant's conduct would have caused . . . .")).

The evidence showed that the beating has had a profound and lasting effect on plaintiff. It caused her significant psychological harm, persisting to this day and showing no signs of abatement, that has seriously diminished her quality of life. Plaintiff's physical injuries were not as great, but considering the testimony that defendants stood over plaintiff, punching and kicking her in the head, the physical damage could have been much worse. Defendants' argument that plaintiff did not suffer any "real harm" is frivolous. Thus, the second factor of the BMW

framework weighs in favor of a substantial punitive damages award here.

The third BMW guidepost calls for a comparison of the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct. Defendants ignore the "criminal penalties" aspect of this guidepost and focus on comparable civil penalties. Unfortunately, defendants give us very little to work with. They cite only a handful of cases, restricted to the Seventh Circuit and district courts therein, that involved small awards. None of their facts--the circumstances, the conduct, the injuries-- are remotely similar to those in the instant case. Plaintiff also cites cases that are not sufficiently similar. From our (non-exhaustive) review of various punitive damage awards in excessive force cases from many jurisdictions, all we can conclude is that there is a tremendous variation. The underlying issue here is whether defendants were put on "fair notice" as to their potential liability for particular misconduct. See Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 83 (1st Cir. 2001) ("[A] reviewing court should search for comparisons solely to determine whether a particular defendant was given fair notice as to its potential liability for particular misconduct, not to determine an acceptable range into which an award might fall.") Defendants have simply failed to show that they were not put on fair notice as to potential liability for their conduct.

Thus, the three main BMW factors suggest that a substantial award of punitive damages against defendants would be consistent with due process. The jury obviously believed that severe punishment of defendants was required, and no reasonable person could disagree with their conclusion. However, we must also consider the financial impact of the award on defendants. In order to constitute punishment, the damages awarded must be collectible. We believe the verdicts against Jeffer and Loizon are far in excess of their ability to pay. The excess amounts will serve no punitive purpose, because the defendants will never pay these amounts. The awards should be reduced to levels the defendants can be expected to pay.

An award "should not be so high as to result in the financial ruin of the defendant" nor should it constitute a "disproportionately large percentage of a defendant's net worth." Vasbinder v. Scott, 976 F.2d 118, 121 (2d Cir. 1992); see also McCollum v. McDaniel, 136 F. Supp. 2d. 472 (D. Md. 2001) (punitive damage awards against police officer defendants were excessive, considering officers' financial resources); Harris v. Harvey, 605 F.2d 330 (7th Cir. 1979) (trial judge should consider reducing punitive award if defendant can show financial hardship); Grauer v. Donovan, No. 92 C 3186, 1996 WL 82462 (N.D. Ill. Feb. 23, 1996) (punitive award was excessive where it would constitute an unreasonable financial hardship for defendant). "[D]amage awards

which greatly exceed the defendant's ability to pay result in a waste of time both for the jury, and later, the bankruptcy courts." Fall v. Indiana Univ. Bd. of Trustees, 33 F. Supp. 2d 729, 747 (N.D. Ind. 1998).

Dennis Andrews, Superintendent of Division I of the Cook County Sheriff's Department, testified that at the time of trial the defendants received "approximately" the following yearly salaries: Officer Jeffer, $45,000; Officer Mazzuca, $45,000; and Sergeant Loizon, $50,000. (Tr. 961.) Defendants' brief does not provide the current figures, but implies that they may be a bit higher: "[N]one of the defendants' incomes exceed $60,000.00 per year." (Defendants' Memorandum at 14 n.27.) Defendants failed to introduce evidence of their net worth.

In determining the appropriate punitive awards, two considerations are important. First, the damages need not be paid all at once. In Illinois, judgments are good for seven years and then may be revived, provided that the revival is within twenty years of the date of judgment. See Fed. R. Civ. P. 69(a) (execution of judgments shall be in accordance with the law of the state in which the district court sits); 735 ILCS 5/12-108(a) (seven-year limitation on enforcement of judgments with provision for revival); 735 ILCS 5/13-218 (judgments may be revived within 20 years after the date of the judgment). So the fact that the defendants may be financially unable to pay a large amount at the

present time,[9] if it be a fact, does not mean that their exposure should be limited to what they are currently able to pay. Their ability to pay over a period of years is the relevant test, and there is no reason the defendants should be absolved from a long-term responsibility for punitive damages in this case.

The second factor to consider is that the defendants will pay not one penny of the compensatory verdicts. The Illinois taxpayers will foot that entire bill, see 745 ILCS 10/9-102, so the only punishment these defendants will experience for their egregious misconduct toward the plaintiff is the payments they will make on the punitive damage verdicts. For that punishment to be meaningful, the court should sustain amounts of the punitive verdicts that are realistically collectible against the defendants over a reasonable period of time in the future.

Another factor to consider is the jury's clear delineation of the relative punishments to be imposed on Jeffer and Loizon. The amount of the punitive award against Loizon is exactly one-third of the award against Jeffer. We will respect that ratio. The $10,000 award against the defendant Mazzuca, on the other hand, seems unrelated to the awards against the other defendants, and it is also an award that raises no problem of excessiveness. There is no reason to disturb it.

---

[9]    Evidence of the defendants' financial situations is sparse, because they offered no information beyond evidence of their salaries.

Considering all of the circumstances, we believe that an appropriate and sustainable punitive award against defendant Jeffer is $150,000 and against the defendant Loizon, $50,000. The punitive damage awards against these two defendants are vacated, and they will be awarded a new trial on the question of punitive damages only, unless plaintiff agrees to remittiturs and accepts punitive damages awards of $150,000 against Jeffer and $50,000 against Loizon.

### CONCLUSION

Defendants' motion to amend judgment is allowed to the extent that remittiturs are granted as to the punitive damage awards against the defendants Jeffer and Loizon. If plaintiff refuses to accept the remittiturs, or either of them, a new trial will be granted, on punitive damages only, as against Jeffer or Loizon or both. Plaintiff should file a statement by May 7, 2002 indicating whether she accepts or rejects the remittiturs.

DATE:  April 23, 2002

ENTER:  _____

John F. Grady, United States District Judge